UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KNOWLEDGE BASED SOLUTIONS, INC.,
d/b/a GENWORKS,
d/b/a GENWORKS INTERNATIONAL,
d/b/a KBS INTERNATIONAL,

      Plaintiff,

v.

REINIER VAN DIJK,

      Defendant.

Case No. 16-cv-13041
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART MOTION TO DISMISS [15]**

---

Plaintiff Knowledge Based Solutions, Inc., doing business as Genworks, is a Michigan-based software company. It formerly licensed its software to Delft University of Technology in the Netherlands. During the time it did so, Defendant Reiner Van Dijk was a graduate student at the university and used Genworks' software as part of his research. Pursuant to a non-disclosure, non-compete agreement, Van Dijk received confidential information about Genworks' proprietary software. Genworks claims that after obtaining this information, Van Dijk created competing software. It further alleges that Van Dijk's new company now licenses that software to TU Delft. Accordingly, Genworks filed suit asserting, among other claims, breach of contract, copyright infringement, misappropriation of trade secrets, and tortious interference with business relationships.

Van Dijk, a Netherlands resident, seeks to have this case dismissed. He asserts lack of personal jurisdiction. In the alternative, Van Dijk says that this forum is too inconvenient and thus dismissal is warranted under the doctrine of *forum non conveniens*. In the second

alternative, Van Dijk offers multiple reasons for dismissing all of Genworks' claims under Federal Rule of Civil Procedure 12(b)(6).

While close, the Court believes that exercising personal jurisdiction comports with due process. And this forum is not too inconvenient. Further, save for one breach of contract claim and Genworks' U.S. copyright claim, Van Dijk has not persuaded the Court to dismiss Genworks' claims under Rule 12(b)(6). All of this is explained in detail below.

## I.

### A.

Genworks is a small, Michigan software company. It has two full-time employees, one of which is David Cooper. (R. 16, PID 321.) Cooper is "primarily responsible for developing, marketing, and support[ing]" Genwork's software. (R. 13, PID 181.) Although small, Genworks has a subsidiary, Genworks B.V., located in Delft, Netherlands. (*See* R. 13, PID 169.)

Genworks makes a knowledge-based engineering system. (R. 13, PID 181–82.) A user of knowledge-based engineering software can write object definitions in a high-level language and then the software will process those definitions into an application. (*See* R. 13, PID 149, 181.) The application might be, for example, a 3D modeling application for designing products. (R. 13, PID 181.) Genworks' knowledge-based engineering system is called the General-purpose Declarative Language software ("GDL Software"). (R. 13, PID 149.) Cooper is the software's creator. (R. 13, PID 181.) There are three versions of the GDL Software: an open-source version, a professional version, and an enterprise version. (R. 13, PID 149.)

Users of the open-source version of the GDL Software are able to examine the source code, copy it, and write new software based on it—subject to certain conditions. ("'Source code' is the part of software that most computer users don't ever see; it's the code computer

2

programmers can manipulate to change how a piece of software—a 'program' or 'application'—works. Opensource.com, *What is Open Source?* https://opensource.com/ resources/what-open-source (last visited Aug. 29, 2017).) To be more specific, the open-source version of the GDL Software ("Open-Source GDL") is covered by the GNU Affero General Public License v3 ("AGPL"), a "copyleft" license generally available to authors of software. Under the AGPL, a user is permitted to "convey a work based on" Open-Source GDL provided that, among other conditions, the user also licenses his software under the AGPL. (R. 13, PID 162.) Thus, in conveying a work based on Open-Source GDL, the user "may not impose any further restrictions on the exercise of the rights granted or affirmed under" the AGPL, including "impos[ing] a license fee, royalty, or other charge for exercise of rights granted under" the AGPL. (R. 13, PID 164.)

The professional and enterprise versions of the GDL Software (collectively, "Proprietary GDL") are covered by the Genworks Software License Agreement ("SLA"). (R. 13, PID 151.) It appears that users of Proprietary GDL do not have access to that software's source code. Indeed, paragraph 5.1(2) of the SLA prohibits copying and reverse engineering Proprietary GDL: "You may not: . . . alter, modify, translate, reverse engineer, decompile, disassemble, macroexpand, or copy (except for the program backup copy) the program or the accompanying documentation, or otherwise attempt to discover the internal workings or any Trade Secrets contained within the Software[.]" (R. 13, PID 152.)

## B.

In 2009, Van Dijk began pursuing a Ph.D. from TU Delft in the Netherlands. (R. 14, PID 251.) Among other topics, Van Dijk conducted research in the field of knowledge-based engineering. (R. 14, PID 252.)

As part of his research, Van Dijk used the GDL Software. (R. 15, PID 252.) Although TU Delft had paid Genworks for a license, Genworks maintains that all users of the GDL Software at the university had to check a box assenting to the SLA. (R. 13, PID 184.)

In December 2010, Van Dijk signed (in the traditional sense) two contracts with Genworks or Genworks B.V.: the Genworks Non-Disclosure/Non-Compete Agreement ("Non-Compete Agreement") and the Genworks Contributor Agreement ("Contributor Agreement"). According to Cooper, the Non-Compete Agreement gave Van Dijk access to the source code for Proprietary GDL. (R. 13, PID 184.) Under the Non-Compete Agreement, unless marked otherwise, "[a]ny information" Van Dijk received from Genworks was to be treated as proprietary, a trade secret, and covered by the agreement. (R. 13, PID 158.) The Non-Compete Agreement also prohibited Van Dijk from "using the Information in any manner or for any purpose which can be considered as competitive with Genworks, as determined by Genworks." (*Id.*) Finally, under the Non-Compete Agreement, Van Dijk agreed to "contribute any useful results or derivations from the Information back to Genworks under the terms of the Genworks Contributor Agreement[.]" (*Id.*) The Contributor Agreement defined "contribution" to mean "any source code, object code, . . . or any other material posted or submitted by [Van Dijk] to a project" and required Van Dijk to assign Genworks joint ownership of any copyright in a "contribution." (R. 13, PID 168.)

In 2013, Van Dijk began developing what would later be known as ParaPy Software. (R. 15, PID 258.) Like GDL Software, ParaPy Software is a knowledge-based engineering system. (R. 15, PID 260.) But unlike GDL Software, which is primarily written in Lisp, ParaPy Software is primarily written in Python. (*See* R. 15, PID 260, 262.) Beyond that similarity and

4

difference, the parties dispute how similar (or dissimilar depending on perspective) ParaPy Software is to GDL Software.

Not long after Van Dijk had been "prototyping" what would later become ParaPy Software, Van Dijk received an email from his professor at TU Delft. (R. 15, PID 261.) According to Van Dijk's translation of that October 2013 email, his professor stated:

> Today I e-mailed Dave Cooper to make an appointment for next week. I hinted that there are development in Delft that have an influence on the use of GDL by TU Delft. He called me 5 minutes later in a slight panic. I told him about the development of a new KBE language and the reason for being disappointed with GDL (emacs, bugs, expensive, lack of documentation, lousy IDE, etc.). He's currently a bit in shock, but I thought it was sincere to inform him about it.

(R. 15, PID 261.)

In 2015, Van Dijk and Cooper attempted to collaborate to create the "next generation dual-technology platform (Lisp/Python)," but the two did not "share the same vision." (R. 15, PID 261.) Van Dijk says that Cooper then sent him a "legal memorandum" asserting copyright infringement. (R. 15, PID 262.) Van Dijk allegedly invited Cooper to come to the Netherlands to examine the code underlying ParaPy Software, but Cooper never did so. (*Id.*) According to Van Dijk, "For almost 1.5 years I didn't hear anything from Cooper." (*Id.*)

In April 2016, Van Dijk founded a company, ParaPy, with non-party Max Baan. (R. 15, PID 260.) The company consists of two entities: a holding company, ParaPy Holding B.V., and an operating company, ParaPy B.V. (*Id.*) "All intellectual property rights are owned by the holding company, not [Van Dijk] or anyone else individually." (*Id.*)

In August 2016, Cooper and Van Dijk ran into each other while rooming in the same house prior to an aerospace conference. According to Van Dijk, Cooper's conference presentation included "a preview of recent developments at Genworks to develop a KBE language in Python." (R. 15, PID 263.) Van Dijk was "surprised to see this sudden and abrupt

5

change after 15 years in Lisp." (*Id.*) Shortly before Van Dijk's presentation, Cooper served Van Dijk with the present lawsuit. (R. 15, PID 263.)

### C.

Genwork's amended complaint asserts seven counts (some with multiple claims). Genworks alleges that in creating or distributing ParaPy, Van Dijk breached provisions of the SLA, the Non-Compete Agreement, the Contributor Agreement, and the AGPL. (R. 13, PID 130–31.) As alternatives, Genworks claims that Van Dijk is liable under the doctrines of promissory estoppel and unjust enrichment. (R. 13, PID 131–33.) Genworks also brings claims under U.S. and Dutch copyright law. (R. 13, PID 134–37.) Genworks further asserts that Van Dijk violated Michigan's trade secrets act. (R. 13, PID 137–39.) Finally, Genworks says that Van Dijk has tortiously interfered with its business relationships. (R. 13, PID 139–40.)

### D.

Van Dijk has moved to dismiss Genworks' amended complaint on several grounds. (R. 15.) First, Van Dijk says that this Court cannot, consistent with the Due Process Clause, require him to defend Genworks' claims in this forum. Van Dijk further argues that even if this Court could properly exercise personal jurisdiction over the claims in this case, the Netherlands is a more convenient forum. And, says Van Dijk, if dismissal under the doctrine of *forum non conveniens* is not proper, the Court should dismiss the amended complaint because Genworks has not stated a claim upon which relief may be granted.

### II.

The Court begins with Van Dijk's personal-jurisdiction defense.

"In deciding a motion to dismiss for lack of personal jurisdiction, the district court may rely upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may

conduct an evidentiary hearing to resolve any apparent factual questions." *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 899 (6th Cir. 2017). Here, the parties have submitted affidavits and have not asked for discovery or an evidentiary hearing. So this means that the Court must view the pleadings and affidavits in the light most favorable to Genworks and ignore Van Dijk's "controverting assertions." *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007). Further, given the absence of discovery or an evidentiary hearing, Genworks need only make a *prima facie* showing that this Court may exercise personal jurisdiction over each claim in this lawsuit. *See MAG IAS Holdings*, 854 F.3d at 899; *Schneider v. Hardesty*, 669 F.3d 693, 699 (6th Cir. 2012).

The reference to "each claim in this lawsuit" is important. Genworks has not asserted that Van Dijk is subject to general jurisdiction in this forum. Instead, Genworks asserts specific jurisdiction. (*See* R. 16, PID 311–18.) But that means that for each claim asserted, personal jurisdiction over that claim is proper only if the claim arises from Van Dijk's contacts with Michigan. *Air Products*, 503 F.3d at 550. So personal jurisdiction must be analyzed on a claim-by-claim basis (which the parties failed to do). *See SunCoke Energy Inc. v. MAN Ferrostaal Aktiengesellschaft*, 563 F.3d 211, 217 (6th Cir. 2009) (White J., concurring) (agreeing with dissent that "personal jurisdiction must be proper as to each claim"); *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).

Before examining each of Genworks' claims, one more point is important. Van Dijk makes no argument that he is beyond the reach of Michigan's long-arm statute. *See Green v. Wilson*, 565 N.W.2d 813, 816–17 (Mich. 1997) (indicating that Michigan's long-arm statute may not be coextensive with the Due Process Clause). Instead, Van Dijk only argues that requiring him to defend in this forum would violate the Due Process Clause. (*See* R. 15, PID 227–34.) A

7

defendant can waive a personal-jurisdiction defense, so, for at least that reason, the Court will consider only the constitutional argument Van Dijk has presented.

The Due Process Clause protects a defendant from having to litigate a claim in a forum that he would not "reasonably anticipate" having to do so. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). In the Sixth Circuit, courts apply the following three-part test to decide whether the exercise of specific jurisdiction is consistent with due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549–50 (6th Cir. 2016). Courts sometimes refer to this as the *Southern Machine* test, *see Air Products*, 503 F.3d at 550, as that was apparently the first case to articulate the three-part inquiry, *see Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

### A.

The Court begins with Genworks' claims that Van Dijk violated the Non-Compete Agreement.

### 1.

If the Court were to focus only on the fact that Van Dijk signed the Non-Compete Agreement, it would not find that Van Dijk purposefully availed himself to the benefits of Michigan. As the Supreme Court has explained, "If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). This rule applies with particular force here

8

because the Non-Compete Agreement might well have been between Van Dijk and Genworks' subsidiary in the Netherlands. (*See* R. 13, PID 158 ("This agreement is made and entered into between Genworks International *or its local subsidiary* . . . . To deliver these terms to us [from Europe], please send . . . to *Genworks BV*" (emphasis added)).)

But "a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." *Burger King*, 471 U.S. at 479 (internal quotation marks omitted). Thus, in assessing purposeful availment, courts are to focus on "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.*

An examination of "the real object of the business transaction" suggests personal availment. Reading the Non-Compete Agreement in the light most favorable to Genworks, Genworks and Van Dijk contemplated an ongoing relationship. As stated in the agreement: "Recipient has indicated a desire to receive confidential, proprietary, and/or trade-secret data or information ('the Information') from Genworks in order to enable Recipient's enhanced use of the GDL KBE development environment." (R. 13, PID 158.) And it is reasonable to infer that the parties in fact had an ongoing relationship. According to Cooper, Van Dijk was given source code for Proprietary GDL only because he signed the Non-Compete Agreement. (R. 13, PID 184.) Cooper also avers, "In reliance upon Defendant's acceptance of the terms set forth in the SLA, [Non-Compete Agreement], [Contributor Agreement], and AGPL, the Defendant and I engaged each other in numerous communications." (R. 13, PID 192.) Cooper suggests that some of these communications were about Proprietary GDL: "[Van Dijk] made heavy use of the Proprietary GDL. This conclusion is supported by the fact that many of his communications referenced the SMLib geometry kernel which was only available in the Proprietary GDL." (R.

9

13, PID 188.) Moreover, the record strongly suggests that Van Dijk was well aware that Cooper resided in Michigan when they discussed GDL Software.

Viewing all of this in the light most favorable to Genworks, Van Dijk repeatedly tapped a source of confidential information that he knew was located in Michigan. And, under the Non-Compete Agreement, each time Van Dijk did so, he was obliged to keep the information secret and not use it to compete with Genworks. This suggests that personal jurisdiction over Genworks' claims that Van Dijk breached the Non-Compete Agreement is proper. *See Burger King*, 471 U.S. at 475–76 ("[W]here the defendant 'deliberately' . . . has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." (citations omitted)); *SunCoke Energy Inc. v. MAN Ferrostaal Aktiengesellschaft*, 563 F.3d 211, 218 (6th Cir. 2009) (White, J., concurring) ("By the very terms of the agreement, defendant knew it was contracting with a company in Tennessee, understood the value of the confidential information to this Tennessee company, and anticipated a course of dealing that would involve accessing information located in Tennessee, protecting that information for the benefit of a Tennessee company, and returning the information to Tennessee.").

One other fact also favors a finding of purposeful availment: the Non-Compete Agreement included a choice-of-law provision that gave Van Dijk some warning that Genworks might sue him in Michigan: "These terms will be governed by the laws of the State of Michigan, USA, or Dutch Law as applied in The Netherlands, *according to the preference of Genworks* on a per-case basis" (R. 13, PID 158 (emphasis added)). *See Burger King*, 471 U.S. at 482 (finding

10

Florida choice-of-law provision "reinforced" the defendant's "deliberate affiliation with [Florida] and the reasonable foreseeability of possible litigation there").

In short, without knowing more about the "quality" of Van Dijk's communications with Cooper, *MAG IAS Holdings*, 854 F.3d at 901, and having to draw reasonable inferences in Genworks' favor, the Court narrowly finds that Genworks has made a *prima facie* showing that Van Dijk purposefully availed himself of a Michigan resource.

Van Dijk argues that there was no purposeful availment because it was Cooper who "demand[ed]" that he sign the Non-Compete Agreement. (*See* R. 20, PID 363.) While Cooper may have required Van Dijk to sign the agreement, the inference this Court must draw is that Copper made that demand because, as the Non-Compete Agreement says, "[Van Dijk] indicated a desire to receive confidential, proprietary, and/or trade-secret data or information . . . from Genworks." Thus, it is fair to infer that it was Van Dijk's interest in Genworks that led to the Non-Compete Agreement, i.e., that Van Dijk sought out an ongoing relationship with a Michigan company. *See Burger King*, 471 U.S. at 473 ("[W]e have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities.").

Van Dijk also claims that this case is "on all fours" with *International Technologies Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386 (6th Cir. 1997). There, a Michigan company had negotiated a contract with a Swiss company to design a European glass factory. *Id.* at 389, 394. When the Swiss company terminated the parties' agreement, the Michigan company sought the return of the proprietary plans that it had developed. *Id.* at 390. The Swiss company declined, and the Michigan company sued in a federal court in Michigan. *Id.* at 387, 390. The Sixth Circuit

11

found that requiring the Swiss company to defend a lawsuit in Michigan would not comport with due process. *Id.* at 394, 396.

There are material differences between the facts of *Euroglas* and the facts of this case. Most significantly, the contract in *Euroglas* included a provision that "placed '[j]urisdiction for [the] contract [in] Berne, Switzerland.'" *Id.* at 393. The Sixth Circuit relied heavily on this fact. It explained, "having agreed that jurisdiction for the contract should be Berne, Switzerland, the plaintiff's current preference for Michigan merits relatively little weight." *Id.* at 394. And in considering Michigan's interest in the litigation, the Court again referenced the jurisdiction provision: "it is far from clear how well the interests of Michigan would be served by telling foreign purchasers of goods and services that if they sign a contract with a corporation domiciled in Michigan, they run the risk of being haled into court in that state even if the contract provides for jurisdiction elsewhere." *Id.* Indeed, it appears that the jurisdiction provision, coupled with the defendants' presence outside the United States, is what drove the Sixth Circuit's analysis: only after concluding that it would be unreasonable to require the defendants to litigate in Michigan did the Court turn to the question of purposeful availment. *See id.* at 394. Here, there is no forum-selection clause. But there is a choice-of-law provision. And that provision favors a finding of minimum contacts.

Van Dijk also relies on *Euroglas* and *Calphalon Corp. v. Rowlette*, 228 F.3d 718 (6th Cir. 2000), to argue that his contacts with Michigan were not purposeful but happenstance. (R. 15, PID 232.) In *Euroglas*, the Court thought that the European defendants' communications with the Michigan company via "letter, telephone, and facsimile" did not amount to purposeful availment. *See* 107 F.3d at 395. The Court explained: "Such communications have no talismanic qualities and the only reason the communications in question here were directed to Michigan was

that [the plaintiff] found it convenient to be present there." *Id.* From the defendants' perspective, said the Court, "it was purely fortuitous that [the plaintiff] happened to have a Michigan address." *Id.*

The reasoning of *Calphalon* is similar. There, Calphalon, an Ohio corporation, sued Rowlette, its sales representative for a region around South Dakota, in an Ohio court (Calphalon wanted a declaration that it did not owe commissions). 228 F.3d at 720–21. Rowlette had communicated with Calphalon via "telephone, fax, and mail" and had made at least two job-related visits to Calphalon. *Id.* at 720. The Court, in part relying on *Euroglas*, reasoned:

> Rowlette's phone, mail, and fax contact with Calphalon in Ohio and J. Rowlette's physical visits there occurred solely because Calphalon chose to be headquartered in Ohio, not because Rowlette sought to further its business and create "continuous and substantial" consequences there. Arguably, Rowlette would have served as Calphalon's representative in the designated states, regardless of Calphalon's base of operation.

228 F.3d at 723. "Thus," the Court concluded, "Rowlette's contacts were precisely the type of 'random,' 'fortuitous,' and 'attenuated' contacts that the purposeful availment requirement is meant to prevent from causing jurisdiction." *Id.*

Van Dijk says he is just like Rowlette in *Calphalon* or the Swiss company in *Euroglas*: it did not matter to him where Genworks was located and so the mere fact that Cooper happened to be in Michigan does not mean his communications with him were purposeful contacts with Michigan. (R. 15, PID 232.)

The Court finds this case distinguishable. In *Euroglas*, it was the Michigan company that traveled to Europe to solicit an agreement from the Swiss company. Here, taking the submissions in the light most favorable to Genworks, it was Van Dijk's interest in Proprietary GDL that led to the Non-Compete Agreement. Moreover, in *Euroglas*, the Court reasoned, "[Defendant] expressly invoked the benefits and protection of Swiss law in negotiating and signing, on Swiss

13

soil, the contract. By its terms, the contract is to be interpreted under Swiss law. There was no purposeful availment of the benefits and protections of Michigan law here, and the defendants' 'contacts' with Michigan are too 'fortuitous' and 'attenuated' to suggest otherwise." 107 F.3d at 396. But here, the Non-Compete Agreement includes a choice-of-law provision that at least arguably invoked "the benefits and protections of Michigan law."

As for *Calphalon*, that case "has often been criticized as irreconcilable with controlling Supreme Court precedent." *August v. Manley Toys, Ltd.,* 68 F. Supp. 3d 722, 731 (E.D. Mich. 2014); *see also Frankenmuth Mut. Ins. Co. v. Appalachian Underwriters, Inc.*, No. 03-10193-BC, 2004 WL 1406121, at *9 (E.D. Mich. June 21, 2004). For example, the *Burger King* Court ruled that "where the defendant 'deliberately' . . . has created 'continuing obligations' between himself and *residents of the forum*, he manifestly has availed himself of the privilege of conducting business there[.]" *Burger King*, 471 U.S. at 475–76 (emphasis added). But the Court need not address that issue as *Calphalon* is distinguishable. "There is no mention in *Calphalon* that Rowlette 'reached out' to Ohio to negotiate with *Calaphon*." *Tharo Sys., Inc. v. Cab Produkttechnik GMBH & Co. KG*, 196 F. App'x 366, 371 (6th Cir. 2006) (distinguishing *Calaphon*). Here, as stated, the Court must presume that it was Van Dijk's interest in Proprietary GDL that led to the Non-Compete Agreement.

In short, while close, the Court finds that Van Dijk purposefully availed himself to a Michigan resource by seeking out and then receiving confidential information from Cooper.

**2.**

Under the second prong of the *Southern Machine* test, this Court must decide whether Genworks' claims that Van Dijk breached the Non-Compete Agreement "arise from" the communications between Cooper and Van Dijk.

14

To answer this question, it is helpful to precisely state Genworks' claims of breach. There are two. Genworks claims that Van Dijk breached a provision (§ 3) of the Non-Compete Agreement by using Genworks' confidential information to create ParaPy, software that is a "direct competitor to the GDL Software." (R. 13, PID 131.) Genworks also claims that Van Dijk breached another provision (§ 2) of the Non-Compete Agreement by sharing Genworks' confidential information with a third person (the co-creator of ParaPy Software). (R. 13, PID 131.)

It is also helpful to precisely state the "arise from" standard. In *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 507–08 (6th Cir. 2014), the Sixth Circuit, adopting the reasoning of the Third Circuit in *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312 (3d Cir. 2007), held that for a plaintiff's claim to "arise from" a defendant's contacts, the "cause of action must be proximately caused by the defendant's contacts with the forum state."[1]

So the question is whether Van Dijk's alleged breaches of §§ 2 and 3 of the Non-Compete Agreement proximately resulted from his communications and exchanges of information with Cooper. Viewing the submissions in the light most favorable to Genworks, the answer is "yes." To be sure, obtaining confidential information was not by itself the wrongful act. Van Dijk had to take the further step of using the confidential information to create competing software or sharing it with a third person. But the proximate-cause test does not

---

[1] In *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007), the Sixth Circuit stated, "We have articulated the standard for [the arise-from] prong in a number of different ways, such as whether the causes of action were 'made possible by' or 'lie in the wake of' the defendant's contacts, *Lanier*, 843 F.2d at 909, or whether the causes of action are 'related to' or 'connected with' the defendant's contacts with the forum state . . . ." While the "made possible by" and "lie in the wake of" articulations are seemingly inconsistent with a proximate-cause test, *Lanier* was actually referring to the "arise from" standard under Michigan's long-arm statute—not the Due Process Clause. *See Lanier v. Am. Bd. of Endodontics*, 843 F.2d 901, 909 (6th Cir. 1988).

demand that the defendant's forum contacts immediately result in the plaintiff's claim. *See O'Connor*, 496 F.3d at 323 ("The causal connection [between contact and claim] can be somewhat looser than the tort concept of proximate causation."). Here, Van Dijk's forum contacts were the communications with Cooper; those communications were made only because Van Dijk had promised to keep the communications confidential and to not use them to compete with Genworks; and Genworks' claims of breach are that Van Dijk did not keep those promises. This causal chain is sufficient: Genworks' claims closely and directly relate to Van Dijk's forum contacts. *See O'Connor*, 496 F.3d at 323 (finding that defendant's mailing of a brochure and phone calls soliciting plaintiffs to purchase spa services were "directly and closely relate[d]" to plaintiff's claim that defendant was negligent when it later provided spa services). The Court therefore finds the proximate-cause test satisfied.

Van Dijk argues that any wrongdoing occurred when he created ParaPy Software, which, he stresses, was done in the Netherlands. But the question is not whether the wrongful conduct occurred in Michigan, it is whether the wrongful conduct "arises from" Van Dijk's Michigan contacts. *See Southern Machine*, 401 F.2d at 381 ("[T]he cause of action must *arise from* the defendant's activities there." (emphasis added)).

Van Dijk also relies on *Euroglas* to argue that the "arise from" prong is not met. There, the Court stated, "The causes of action arose not from the defendants' activities in Michigan, but from the use made of the intellectual property outside Michigan in alleged violation of an obligation that stemmed from the contract." 107 F.3d at 396. But in *Euroglas*, the contract containing the confidentiality provision had expired before the Swiss company refused to return the factory plans and shared them with third parties. *See id.* at 390. And, perhaps for that reason, the plaintiff did not even sue for breach of contract. *See id.* In contrast, Van Dijk's forum contact

16

was under the Non-Compete Agreement and it is that agreement that Genworks claims Van Dijk breached.

In short, taking the facts in the light most favorable to Genworks, Genworks' claims that Van Dijk breached the Non-Compete Agreement "arise from" Van Dijk's purposeful contacts with Michigan.

### 3.

Under the third part of the *Southern Machine* test, this Court is to determine whether the defendant's contacts with the forum are "substantial enough" to make the exercise of jurisdiction "reasonable." *Southern Machine*, 401 F.2d at 381. In assessing reasonableness, courts consider "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." *Air Prod.*, 503 F.3d at 554–55. When, as here, the first two specific-jurisdiction prongs are satisfied, "an inference of reasonableness arises" and "only the unusual case will not meet" the third part of the *Southern Machine* test. *See id.* at 554.

While close, Van Dijk has not rebutted the presumption of reasonableness. To be sure, one aspect of this case is somewhat unusual: Van Dijk's is not just in another state, but another country. *See Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty.*, 480 U.S. 102, 115 (1987) ("Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." (internal quotation marks omitted)). But Van Dijk speaks English (and, based on his declaration, quite well), has visited the United States in connection with ParaPy B.V., can litigate much of this case through the use of technology, and the Court would require Genworks to travel to the Netherlands to take Van Dijk's deposition. As for the forum-interest factor, Michigan has an interest in protecting the confidential information

17

of a Michigan company. The Netherlands may have an interest in adjudicating a case where one of its residents is accused of breaching a non-compete or non-disclosure agreement. But that interest is mitigated by the contract: it permits Genworks to choose the law that governs. And, based on the complaint, Genworks has chosen (in the first instance) U.S. and Michigan law.

Ultimately, the "reasonableness" prong is a close call because Van Dijk's contacts with Michigan are not very "substantial" and he resides in the Netherlands. But there is a presumption of reasonableness and the burden on Van Dijk of litigating in this forum is not overwhelming. So the Court finds the third prong of the *Southern Machine* test met.

* * *

In sum, "[w]here, as here, the district court relies solely on written submissions and affidavits to resolve a Rule 12(b)(2) motion, . . . the burden on the plaintiff [to establish personal jurisdiction] is 'relatively slight.'" *Air Prod.*, 503 F.3d at 549. Genworks has carried its relatively slight burden of showing that litigating the Non-Compete Agreement in this forum does not violate Van Dijk's rights under the Due Process Clause.

## B.

That conclusion raises this question: how much more burden would be placed on Van Dijk if he were required to litigate Genworks' remaining claims in this forum? If the answer is "not too much more," then it would not offend due process (and would conserve the parties' and the courts' resources) to litigate all the claims together. In particular, under the doctrine of "pendent personal jurisdiction" a court may assert "personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368

18

F.3d 1174, 1180 (9th Cir. 2004); *see also United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002) ("[T]he majority of federal district courts and every circuit court of appeals to address the question have upheld the application of pendent personal jurisdiction."); Charles Alan Wright, *Pendent Personal Jurisdiction*, 4A Fed. Prac. & Proc. Civ. § 1069.7 (4th ed.).

To conduct the pendent personal jurisdiction analysis, it is helpful to first identify the "nucleus of operative fact" underlying Genworks' claims that Van Dijk breached the Non-Compete Agreement. Genworks intends to show breach by proving that Van Dijk used the confidential information it provided under the Non-Compete Agreement to develop ParaPy Software. The key factual inquiries thus appear to be the following: what Genworks shared, when Genworks shared it, how and when ParaPy Software was developed (and with whom), and the similarities between the information that Genworks shared and the completed ParaPy Software. The first inquiry has been partly answered: Genworks at least shared the source code to Proprietary GDL under the Non-Compete Agreement.

Utilizing this analysis, Genworks' other claims also require answering these factual inquiries.

Starting with copyright infringement, it appears that (subject to the conditions of the AGPL) Van Dijk could copy and make a derivative work of Open Source GDL. So Genworks' copyright claim appears to be primarily based on showing that Van Dijk copied the source code (or other expression) of Proprietary GDL. Yet, as just noted, to prove that Van Dijk breached Non-Compete Agreement, Genworks intends to show that Van Dijk used confidential information about Proprietary GDL to create ParaPy Software. Thus, establishing the factual basis for this claim of breach will likely establish much of the factual basis for Genworks' claims of copyright infringement. The copyright claims are pendent.

19

Genworks' trade-secrets claim is also pendent to the Non-Compete Agreement claims. Among the trade secrets that Van Dijk is accused of misappropriating are components of Proprietary GDL. (*See* R. 13, PID 127, 138.) Thus, evidence showing that Van Dijk misused confidential information shared under the Non-Compete Agreement, e.g., the source code to Proprietary GDL, is evidence that Van Dijk misappropriated Genworks' trade secrets.

The Court may also exercise pendent personal jurisdiction over Genworks' claim that Van Dijk breached the Contributor Agreement. Genworks says that Van Dijk breached that contract "by failing to assign an ownership interest to the Derivative Work to Genworks." (R. 13, PID 131.) But the Contributor Agreement by itself did not require Van Dijk to assign an ownership interest in a derivative work; instead, it was the Non-Compete Agreement that required Van Dijk to "contribute any useful results or derivations from the Information back to Genworks under the terms of the Genworks Contributor Agreement[.]" (R. 13, PID 158.) And the referenced "Information" is, of course, the information shared under the Non-Compete Agreement. Thus, to prove that Van Dijk failed to assign an ownership interest in a derivative work, Genworks will have to show that ParaPy Software is a "useful result[] or derivation[]" of the confidential information shared under the Non-Compete Agreement. That is very similar to showing that Van Dijk breached the confidentiality and non-compete provision of the Non-Compete Agreement.

Genworks' claim that Van Dijk has tortiously interfered with Genworks' customer relationships also substantially overlaps with Genworks' claims that Van Dijk beached the Non-Compete Agreement. Certainly, the exact same facts do not underlie the claims. Establishing that Van Dijk breached the Non-Compete Agreement does not require Genworks to show that Van Dijk solicited Genworks' customers. And Van Dijk defends the tortious interference claim by

20

arguing that it was not him but ParaPy B.V. that interfered; this too does need not be answered to decide whether Van Dijk breached the Non-Compete Agreement. On the other hand, the reason that Genworks claims that marketing ParaPy Software is tortious interference (and not lawful interference) is because it believes ParaPy was created by using the confidential information shared under the Non-Compete Agreement. In other words, to establish tortious interference, Genworks will need to show that ParaPy Software was developed contrary to the terms of the Non-Compete Agreement. So key facts overlap.

With respect to the Software License Agreement, Genworks claims that Van Dijk breached paragraph 5.1(2). (R. 13, PID 130.) That contract provision prohibited Van Dijk from reverse engineering Proprietary GDL or otherwise attempting to discover the "internal workings or any Trade Secrets contained" in Proprietary GDL. (R. 13, PID 152.) But it appears that under the Non-Compete Agreement, Genworks *gave* Van Dijk the source code for Proprietary GDL. In other words, Genworks need not establish that Van Dijk reverse engineered anything to establish a breach of the Non-Compete Agreement, but Genworks needs to establish that Van Dijk reverse engineered Proprietary GDL to show a breach of paragraph 5.1(2) of the SLA. Even so, factual discovery on one claim will go to both. In establishing whether ParaPy Software was based on information shared under the Non-Compete Agreement, the parties will likely focus their discovery on how Van Dijk developed ParaPy Software. And in charting ParaPy's development, any reverse engineering would likely come to light. Thus, while close, the extra burden placed on Van Dijk of defending Genworks' breach-of-SLA claim in this forum does not violate due process. *See Rice v. Nova Biomedical Corp.*, 763 F. Supp. 961, 966 (N.D. Ill. 1991) ("Since the first two counts are substantially interrelated to Count III and [Defendant] is already properly before [the court] on Count III, from the standpoint of fundamental fairness as to contacts with

21

and convenience of the forum, [Defendant] loses nothing by being subject to [the court's] judgment on the other two counts.").

The Court also finds the question of whether it is proper to exercise pendent personal jurisdiction over Genworks' claim that Van Dijk breached the GNU Affero General Public License v3 to be a close call. The AGPL protected Open-Source GDL (the version of the software where users had access to the source code). In contrast, the Non-Compete Agreement protected Proprietary GDL. Thus, Genworks can establish a breach of AGPL without establishing that Van Dijk breached the Non-Compete Agreement—and vice versa. Even so, the exercise of pendent personal jurisdiction over the AGPL claim is proper. Every component of Open-Source GDL is present in Proprietary GDL. (R. 13, PID 127.) Thus, the task of comparing ParaPy Software with Proprietary GDL overlaps with the task of comparing ParaPy Software to Open-Source GDL. As with the SLA claim, the Court thus does not find that the extra burden placed on Van Dijk of defending Genworks' breach-of-AGPL claim violates due process.

As for Genworks' promissory estoppel and unjust enrichment claims, they are merely alternative legal theories for its breach-of-contract claims. The Court has found that Genworks' claims that Van Dijk breached the SLA, Contributor Agreement, and AGPL are pendent to Genworks' claims that Van Dijk breached the Non-Compete Agreement. It follows that promissory estoppel and unjust enrichment claims are also pendent.

* * *

In sum, Genworks' claim that Van Dijk violated the Non-Compete Agreement by using confidential information, including the source code for Proprietary GDL, to create ParaPy substantially overlaps with all of Genworks' other claims in this lawsuit. The exercise of pendent personal jurisdiction is thus proper. *See Cohen v. Facebook, Inc.*, No. 16CV4453NGGLB, 2017

WL 2192621, at *9 (E.D.N.Y. May 18, 2017) (providing that the exercise of pendent personal jurisdiction "should be informed by considerations of juridical economy, convenience, and fairness to litigants.").

### III.

Van Dijk says that even if requiring him to defend this lawsuit in Michigan does not violate the Due Process Clause, this case should be dismissed because this forum is too inconvenient. (R. 15, PID 235.) With the exception of one claim—Genworks' claim under Dutch copyright law involving alleged infringements that occurred only in the Netherlands—the Court disagrees with Van Dijk. The Court first conducts the *forum non conveniens* analysis as to all other claims, and then turns to the Dutch copyright claim.

### A.

To obtain dismissal under the doctrine of *forum non conveniens*, Van Dijk must make two showings. The first is that there is another forum "available and adequate" for litigating this case. *Duha v. Agrium, Inc.*, 448 F.3d 867, 873 (6th Cir. 2006). This is not a high bar, *Solari v. Goodyear Tire & Rubber Co.*, 654 F. App'x 763, 766 (6th Cir. 2016), and the Court will assume Van Dijk has cleared it. The Court may proceed this way because, with the exception of the Dutch copyright claim, Van Dijk has not made the second showing: that "the balance of private and public factors listed in" *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947), tilt in his favor, *Duha*, 448 F.3d at 873.

Before weighing those factors, it is important to note that the scale starts off favoring Genworks. Genworks is a U.S. company and has filed suit in a U.S. forum. In that scenario, the general rule is that dismissal for *forum non conveniens* is proper "only when the defendant establishes such oppressiveness and vexation to a defendant as to be out of all proportion to

23

plaintiff's convenience." *Duha*, 448 F.3d at 874 (internal quotation marks and alterations omitted).

Van Dijk says that is too much deference to afford Genworks' choice of forum because Genworks has a subsidiary in the Netherlands. (R. 15, PID 236.) It is true that there is something of a sliding scale, with a plaintiff's choice of a U.S. forum being owed less deference as the plaintiff's ties with the U.S. become weaker. *See Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 494 (6th Cir. 2016). And it is true that it was Genworks B.V. that licensed Proprietary GDL to TU Delft and that it is Van Dijk's alleged misuse of that software that is at the heart of this case.

Even so, the Court finds it still owes significant deference to Genworks' choice of this forum. To start, it is Genworks—not its subsidiary in the Netherlands—that is the plaintiff in this case. Genworks is a Michigan corporation with its principle place of business in Michigan. (R. 13, PID 122.) One of Genworks' two employees is Cooper, and it appears that Cooper was domiciled in Michigan during all times relevant to this lawsuit (and still is now). Thus, this case is very dissimilar from those where the Sixth Circuit provided less deference to the plaintiff's choice of forum. *Cf. Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 494 (6th Cir. 2016) (plaintiffs, U.S. citizens, had lived in Germany for the 12 years preceding the lawsuit); *Kryvicky v. Scandinavian Airlines Sys.*, 807 F.2d 514, 515, 517 (6th Cir. 1986) (plaintiff, U.S. citizen, had lived in Spain for over eight years preceding the lawsuit). And even in these two cases, some deference was still owed to the forums the plaintiffs selected. *See Hefferan*, 828 F.3d at 494; *Kryvicky*, 807 F.2d at 517. It therefore appears that Van Dijk's burden of litigating here must be "out of all proportion" to Genworks' convenience of litigating here for dismissal for *forum non conveniens* to be proper. *Cf. Duha*, 448 F.3d at 875 (applying "out of all proportion" standard

24

where plaintiff had worked in foreign country for nearly two years and dispute arose out of that work, but plaintiff maintained his residence in the U.S. even while working abroad). And even if Van Dijk's burden is not quite that heavy, it is clear that significant deference is owed to Genworks' choice of a Michigan forum.

The private and public interest factors do not weigh strongly enough in favor of Van Dijk such that the scale tips back in his favor. Start with the private interest factors. Regarding "ease of access to sources of proof," *Gulf Oil*, 330 U.S. at 508, Van Dijk stresses that the code and documentation for ParaPy is located in the Netherlands and that relevant witnesses are also located there (R. 15, PID 237). But, on the present record, it appears that there are only three key witnesses in the Netherlands (Van Dijk, his promotor, and the co-creator of ParaPy Software) and there is at least one key witness in the U.S. (Cooper). And while certain evidence pertaining to ParaPy Software and its development are likely in the Netherlands, certain evidence pertaining to Proprietary GDL is likely in the U.S. Moreover, examining the "location" of the "documentary" evidence in a case like this is something of a fiction: the Court is quite confident that the software and much of the associated documentation and communications are stored electronically and can be transferred via the Internet. Van Dijk also says that the "compulsory process" factor favors him. *See Gulf Oil*, 330 U.S. at 508. But that factor is given less weight where there has been no showing that foreign witnesses are unwilling to appear in the U.S. forum. *See Duha*, 448 F.3d at 877. And Van Dijk has made no showing. (*See* R. 13, PID 237.) As for "the cost of obtaining attendance of willing[] witnesses," *Gulf Oil*, 330 U.S. at 508, Van Dijk points out that he is a Ph.D. student and ParaPy B.V. is just a startup. (R. 15, PID 238.) But Genworks is just a two-person company. Further, the Court can minimize the costs to Van Dijk

and other witnesses in the Netherlands by requiring Genworks to take their depositions where they reside. The private interest factors weigh only slightly in Van Dijk's favor.

And, as far as Genworks' claims under U.S. and Michigan law go, the public interest factors do not favor Van Dijk. Although "[a]dministrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin," *Gulf Oil*, 330 U.S. at 508, it is not clear that the Netherlands is the "origin" of this dispute and, more importantly, Van Dijk has made no showing that this judicial district is a "congested center," (*see* R. 15, PID 238). And a jury trial will not burden "a community which has no relation to the litigation, *Gulf Oil*, 330 U.S. at 509: Genworks is a Michigan company and Cooper is a Michigan resident. And while there is a "local interest in having localized controversies decided at home," *Gulf Oil*, 330 U.S. at 509, home is at least arguably Michigan—the case involves misappropriated intellectual property that was developed in Michigan by a Michigan company.

In sum, significant deference is owed to Genworks' selection of a Michigan forum and, with exception for Genworks' Dutch copyright claim, the public and private interest factors do not strongly favor Van Dijk.

### B.

In two recent cases, the Sixth Circuit admonished the district court for failing to conduct a separate *forum non conveniens* analysis for each claim. *Zions First Nat. Bank v. Moto Diesel Mexicana, S.A. de C.V.*, 629 F.3d 520, 526 (6th Cir. 2010); *Duha*, 448 F.3d at 879. The reason for a claim-by-claim *forum non conveniens* analysis is that the balance of the private and public interest factors may be claim dependent. *See Duha*, 448 F.3d at 879. But in *Duha* and *Zions*, "at least one of the claims largely depended on evidence in the United States," yet "the district court[s] dismissed after focusing on and analyzing only the claim most dependent upon evidence

26

located in a foreign forum." *Solari v. Goodyear Tire & Rubber Co.*, 654 F. App'x 763, 769 (6th Cir. 2016) (discussing *Duha* and *Zions*). This Court has not conducted the *forum non conveniens* inquiry by focusing on the one claim that would permit dismissal while ignoring others. Moreover, the Court has already found that all the claims in this lawsuit share a common nucleus of operative fact with Genworks' claim that Van Dijk breached the Non-Compete Agreement. Further still, Van Dijk has made no attempt to show that any particular claim should be dismissed while others remain.

That said, the public interest factors are markedly different with respect to Genworks' claim based on Dutch copyright law. Although it did not favor Van Dijk with respect to Genworks' other claims, the foreign-law factor strongly favors him with respect to Genworks' Dutch copyright claim. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) ("There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself."). This Court has no familiarity with Dutch copyright law. And, as will be explained below, Genworks has not pled acts of infringement that occurred in the United States. Moreover, "it is not clear that [Dutch] courts would even recognize an American judgment based on [Dutch] copyright law." *Wallert v. Atlan*, 141 F. Supp. 3d 258, 282 (S.D.N.Y. 2015). Genworks' Dutch copyright claim will thus be conditionally dismissed under the doctrine of *forum non conveniens*. *See id.* ("[T]he Court finds that the difficulty of applying [foreign law] . . . is a significant factor in the balance of convenience factors." (internal quotation marks omitted)).

This conclusion means that the Court must partly revisit an assumption it made earlier: that another forum is "available and adequate" for litigating Genworks' claims. "Ordinarily, this

requirement will be satisfied when the defendant is amenable to process in the other jurisdiction." *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981) (internal quotation marks omitted). Here, Van Dijk has averred that if he were sued in the Netherlands, he would "consent to jurisdiction there." (R. 15, PID 268.) While that often ends the matter, Genworks claims that this is one of the "rare circumstances . . . where the remedy offered by the other forum is clearly unsatisfactory." *See Piper*, 454 U.S. at 255 n.22. This is so, says Genworks, because a Dutch court cannot enjoin Van Dijk from importing ParaPy Software into the U.S. (R. 16, PID 319). Genworks cites no authority to back this assertion. Moreover, it is not clear that a Dutch court would not be able to enjoin Van Dijk from distributing infringing works generally or exporting ParaPy Software from the Netherlands. *See Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd.*, 61 F.3d 696, 702 (9th Cir. 1995) ("[T]he territorial limits of the Singapore Copyright Act cannot prevent the High Court of Singapore from granting Creative's request to permanently enjoin Aztech's infringing conduct in Singapore. Indeed, we are unable to conceive of a more effective means of protecting Creative's United States copyright interests than by shutting off the pipeline of infringing goods at the source."). In any event, the "clearly unsatisfactory" threshold is not crossed simply because a plaintiff's preferred remedy is not available in the alternative forum. *See Solari v. Goodyear Tire & Rubber Co.*, 654 F. App'x 763, 767 (6th Cir. 2016) (finding that "lack [of] class actions, procedural mechanisms to discover prospective class members, and injunctive relief for medical monitoring" did not make French forum inadequate). Accordingly, the Court finds that a Dutch court is an adequate forum for adjudicating Genworks' Dutch copyright claim.

* * *

28

In short, Van Dijk has not shown that this forum is too inconvenient for litigating Genworks' claims based on U.S. and Michigan law. But he has done so with respect to Genworks' claim under Dutch copyright law.

## IV.

In the second alternative, Van Dijk argues that all of Genworks' claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

To succeed on this theory, Van Dijk must show that the factual allegations of Genworks' complaint do not permit "the reasonable inference that [he] is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, if Genworks' complaint presents enough factual matter to "nudg[e]" its claims "across the line from conceivable to plausible," dismissal is not warranted. *See Iqbal*, 556 U.S. at 683 (internal quotation marks omitted). Determining plausibility is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Id.* at 679.

In making the plausibility determination, the materials this Court may consider are restricted. In addressing personal jurisdiction and *forum non conveniens*, the Court considered Van Dijk's affidavit and the exhibits attached to his affidavit. But in addressing Van Dijk's arguments under Rule 12(b)(6), the Court may not consider those materials—unless they are both referenced in the complaint and central to Genworks' claims. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001). That seems not to be the case, and Van Dijk has made no argument that it is. So the Court will proceed with a narrower focus: the complaint and its exhibits.

Before turning the merits of Van Dijk's Rule 12(b)(6) arguments, the Court notes that the arguments on both sides could have been better developed. Van Dijk made strong arguments

based on personal jurisdiction and *forum non conveniens*. But, perhaps because most of his briefing was focused on those two grounds for dismissal, some of his Rule 12(b)(6) arguments are not well developed. And Genworks has not helped matters. It has attempted to defend all seven of its counts (raising no less than 11 claims) in five pages. Thus, the Court was forced to perform significant independent research and analysis. And even then, as will be explained, some issues remain unresolved.

## A.

Van Dijk says that this Court must dismiss Genworks' claim that he violated the U.S. Copyright Act because "the entire act of alleged infringement occurred outside the U.S." (R. 15, PID 245.) The Court agrees.

"[I]t is a long-standing principle that United States copyright laws do not have extraterritorial operation." *Liberty Toy Co. v. Fred Silber Co.*, 149 F.3d 1183 (table), 1998 WL 385469, at *3 (6th Cir. 1998); *accord Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1094 (9th Cir. 1994); *Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 123 (D.D.C. 2011). So "if all the copying or infringement occurred outside the United States, the Copyright Act would not apply." *Liberty Toy*, 1998 WL 385469, at *3.

Genworks does not dispute this rule; instead it argues that it has pled acts of infringement in the United States. (*See* R. 16, PID 327.) Genworks points to its allegation that Van Dijk made a presentation about ParaPy Software at an aerospace conference held in the U.S. (R. 13, PID 125, 136, 175–76.)

Genworks cites no law to support its belief that Van Dijk's presentation was an act of copyright infringement; and there is law to the contrary. Start with the Copyright Act itself. It prohibited Van Dijk from "reproduc[ing]" GDL Software, 17 U.S.C. § 106(1), "prepar[ing]

30

derivative works based upon" GDL Software, § 106(2), and "distribut[ing] copies or phonorecords of [GDL Software] to the public by sale or other transfer of ownership, or by rental, lease, or lending," § 106(3). Even assuming that Van Dijk copied GDL Software in writing ParaPy Software, giving a presentation about ParaPy Software at a conference is different from distributing it. *See BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 149 F. Supp. 3d 634, 667 (E.D. Va. 2015) ("A distribution occurs when a work is transferred to the public 'by sale or other transfer of ownership, or by rental, lease, or lending.' 17 U.S.C. § 106(3). . . . [C]learly missing from the list is an offer to sell, transfer, rent, lease, or lend a work."); *Atl. Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 983 (D. Ariz. 2008) ("The court agrees with the great weight of authority that § 106(3) is not violated unless the defendant has actually distributed an unauthorized copy of the work to a member of the public. . . . Unless a copy of the work changes hands in one of the designated ways, a 'distribution' under § 106(3) has not taken place."). True, some courts have found that merely making a copy publicly accessible (either via a library or the Internet) counts as "distribution." *E.g.*, *Hotaling v. Church of Jesus Christ of Latter–Day Saints*, 118 F.3d 199 (4th Cir.1997); *Universal City Studios Prods. LLLP v. Bigwood*, 441 F. Supp. 2d 185, 191 (D. Me. 2006). But Genworks has not pled that Van Dijk made copies of GDL Software or ParaPy Software available for purchase at the aerospace conference.

Genworks also asserts that ParaPy B.V.'s customers include TU Delft, Fokker Aerostructrues, and Fokker Elmo. (R. 13, PID 122.) But Genworks has not pled that any of these entities have locations in the U.S. And even if they do, Genworks has not pled that Van Dijk sent copies of GDL Software or ParaPy Software to these companies' U.S. locations.

31

In short, Genworks' has not pled that Van Dijk committed any infringing act in the United States. Genworks' claim based on the U.S. Copyright Act will thus be dismissed.

**B.**

Van Dijk asserts that Genworks' breach-of-contract, promissory-estoppel, unjust-enrichment, and tortious-interference claims are preempted by the U.S. Copyright Act and by Michigan's Uniform Trade Secrets Act. (R. 15, PID 239–40.) The Court declines to address this issue because it is not adequately briefed—by either party.

Stripping away Van Dijk's verbatim recitation of the two statutory preemption provisions, Van Dijk's preemption argument spans a single page. (*See* R. 1, PID 240.) He makes no attempt to separately address the five different breach-of-contract claims, not to mention the promissory estoppel, unjust enrichment, and tortious interference claims. And separate analysis would be helpful. For example, Van Dijk's blanket assertion of preemption gives no clue as to why he thinks Genworks' claim based on the confidentiality provision of the Non-Compete Agreement would be preempted. *See Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 909 (2d Cir. 2011) ("[C]laims based on breaches of . . . contractual promises of confidentiality . . . often survive preemption because the underlying right they seek to vindicate is the right to redress violations of a particular duty or promise different from an exclusive right protected by copyright." (internal quotation marks omitted)). As another example, take Genworks' claim that Van Dijk breached § 5.1(2) of the SLA by reverse engineering Proprietary GDL to discover trade secrets. Van Dijk says nothing about the fact that § 5.1(2) can apparently be breached by taking an idea instead of copying expression. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 535 (6th Cir. 2004) ("[A] copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea

itself."). And Michigan's Uniform Trade Secrets Act would not preempt these two contract claims. *See* Mich. Comp. Laws Ann. § 445.1908 ("This act does not affect any of the following: (a) Contractual remedies, whether or not based upon misappropriation of a trade secret."). Indeed, the one MUTSA preemption case Van Dijk cites (in a footnote without explanation) involved preemption of a tortious-interference claim, not a breach-of-contract claim. *See Compuware Corp. v. Int'l Bus. Machines Corp.*, No. 02-CV-70906, 2003 WL 23212863, at *8 (E.D. Mich. Dec. 19, 2003).

Genworks' arguments fare no better. It responded to Van Dijk's argument that eight of its claims are preempted in half of one page. (R. 16, PID 323.) And all Genworks says in that half page is that a copyright protects expression and not ideas. There is not even a mention of MUTSA.

In sum, determining whether a claim is preempted requires a careful examination of the right allegedly violated, the facts underlying the alleged violation, and the rights provided by the Copyright Act and MUTSA. *See Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1304 (D.C. Cir. 2002) ("To determine whether a state law claim is qualitatively different from a copyright claim—that is, whether the state claim has an 'extra element'—courts generally examine both the elements of the state law cause of action and the way the plaintiff has actually pled that cause of action."). And this is not a simple task when eight claims are involved. (And arguably there are more than eight: Genwork's promissory-estoppel and unjust-enrichment claims involve several representations.) The issue is further complicated by the fact that Genworks has no claim under the U.S. Copyright Act because all alleged infringement occurred outside the U.S. Yet the parties have essentially invited the Court to figure all this out. The Court declines that invitation. *See Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010) ("It is not sufficient for

a party to mention a possible argument in a most skeletal way, leaving the court to put flesh on its bones."); *Beedle v. Demasi*, No. 05-70430, 2006 WL 2457619, at *2 (E.D. Mich. Aug. 22, 2006).

## C.

Aside from preemption, Van Dijk makes several additional arguments for dismissing Genworks' breach-of-contract claims. One is a general attack on all of Genworks' contract claims; the others are tailored to each claim. The Court starts with the general argument first, then turns to the more specific ones.

## 1.

According to Van Dijk, all of Genworks' contract claims must be dismissed because any harm from his breaches "stems" not from him but "from *ParaPy B.V.* licensing its product in competition with [Genworks]." (R. 15, PID 240–41.)

Although Genworks has said nothing about this argument, the Court declines to dismiss all of Genworks' contract claims on this basis. Under Michigan law, a plaintiff may recover those damages "that arise naturally from the breach or those that were in the contemplation of the parties at the time the contract was made." *Kewin v. Massachusetts Mut. Life Ins. Co.*, 295 N.W.2d 50, 52–53 (Mich. 1980); *see also Lawrence v. Will Darrah & Assocs., Inc.*, 516 N.W.2d 43, 48 (Mich. 1994). Genworks has alleged that Van Dijk breached the Non-Compete Agreement by using the confidential information it provided to create a competing product, ParaPy Software. It is plausible that the natural consequence of Van Dijk's creation of a competing product was the creation of a company for purposes of marketing and licensing that product. Similar reasoning applies to Genworks' claim that Van Dijk breached the SLA by reverse engineering Proprietary GDL. As for Genworks' claim that Van Dijk breached the Contributor

34

Agreement by failing "to assign an ownership interest" in ParaPy Software to Genworks (R. 13, PID 131), that claim does not depend on Van Dijk's (or ParaPy B.V's) licensing of ParaPy Software.

But Genworks' claim that Van Dijk breached the AGPL by charging a license fee for ParaPy Software is different from the other breach-of-contract claims. (*See* R. 13, PID 131, 164.) This claim is not merely that Genworks is *damaged* when ParaPy Software is licensed for a fee, but that licensing ParaPy Software for a fee is itself the *breach*. So, as to the AGPL claim, the question is whether the complaint adequately pleads that it was Van Dijk, as opposed to ParaPy B.V., that charged a license fee (and thus, it was Van Dijk and not ParaPy B.V. that breached).

It appears that it does not. True, Genworks pleads that "Defendant," i.e., Van Dijk, breached the AGPL by creating ParaPy Software and then charging a license fee for it. (R. 13, PID 131.) But elsewhere in its complaint, Genworks pleads that ParaPy B.V. is "an entity founded and owned by [Van Dijk]" and then lists customers of ParaPy B.V. (R. 13, PID 121–22.) And Genworks also pleads that when Van Dijk gave a presentation about ParaPy Software at the aerospace conference, he did so in his capacity as ParaPy B.V.'s CEO. (*See* R. 13, PID 176.) Taking a common sense approach to these allegations, *Iqbal*, 556 U.S. at 679, it seems that all licensing of ParaPy Software is via Van Dijk's company, rather than Van Dijk. To infer otherwise requires this reasoning: despite creating ParaPy B.V., making presentations about ParaPy Software as ParaPy B.V.'s CEO, and obtaining customers for ParaPy B.V., Van Dijk still licenses ParaPy Software personally. That seems implausible.

Accordingly, the Court will dismiss Genworks' claim that Van Dijk breached the AGPL. Dismissal will, however, be without prejudice to Genworks' right to better articulate a claim that

Van Dijk breached the AGPL by licensing ParaPy Software or otherwise breached that agreement.

**2.**

Remaining for consideration are Van Dijk's arguments specifically tailored to the SLA, Non-Compete Agreement, and the Contributor Agreement.

Regarding the SLA, Van Dijk points out that it was TU Delft, not the university's students, that licensed Proprietary GDL. (R. 15, PID 241.) He thus argues that Genworks' conclusory allegation that he checked a box does not permit this Court to infer that he assented to the SLA. (*Id.*)

The Court disagrees. Cooper's affidavit—which is proper for consideration on a Rule 12(b)(6) motion because it is attached to Genworks' complaint—says, "All users of the Genworks Software at the TU Delft were issued personalized license-key files that were individually identified and delivered by email address. In order to access those files and run the GDL Software, the Defendant was required to 'check' a checkbox indicating acceptance of the SLA." (R. 13, PID 184.) Together, these allegations permit the Court to reasonably infer that Van Dijk assented to the terms of the SLA.

As for the Non-Compete Agreement, Van Dijk asserts that Genworks' claims of breach must be dismissed because the Non-Compete Agreement is too indefinite and its non-compete provision is too broad. (*See* R. 5, PID 241; R. 20, PID 324.)

Neither assertion is adequately developed. As to indefiniteness, Van Dijk says that the Non-Compete Agreement does "not define 'Information,' nor does it identify any information given to Defendant." (R. 15, PID 241.) But Van Dijk says nothing about this provision of the Non-Compete Agreement: "Any information received by Recipient from Genworks which is not

36

otherwise marked or labeled, shall be considered as 'Proprietary' and 'Trade Secret' and shall be covered by the terms of this Agreement." (R. 13, PID 158.) And Van Dijk says nothing about the general rule that "if a contract is ambiguous, then extrinsic evidence is admissible to determine the actual intent of the parties." *Shay v. Aldrich*, 790 N.W.2d 629, 641 (Mich. 2010); *see also Klapp v. United Ins. Grp. Agency, Inc.*, 470, 663 N.W.2d 447, 454 (Mich. 2003) ("[A] written instrument is open to explanation by parol or extrinsic evidence . . . where the language employed is vague, uncertain, obscure, or ambiguous." (internal quotation marks omitted)).

As for Van Dijk's overbreadth argument, the whole of it is two sentences: "to the extent Plaintiff contends that [the Non-Compete Agreement] prevents Defendant from working in the KBE field (FAC ¶19B), this agreement is an illegal restriction and void" and "[t]he NCA is facially void; it does not define confidential information, explain competition restrictions, or have a time limit." (R. 15, PID 242; R. 20, PID 366.) In support of these sweeping assertions, Van Dijk cites (without discussion) a single case finding a non-compete overbroad. (R. 20, PID 366.) But the non-compete in that case was part of an employer-employee contract that prohibited the employee from working for a competitor. *Mapal, Inc. v. Atarsia*, 147 F. Supp. 3d 670, 675 (E.D. Mich. 2015). The Non-Compete Agreement does not arise from an employer-employee relationship. And that might matter. *See Woodward v. Cadillac Overall Supply Co.*, 240 N.W.2d 710, 715 (Mich. 1976) (Williams, J. dissenting) (discussing several reasons why non-compete clauses in employment contracts should be subject to heightened scrutiny, including unequal bargaining power).

In short, given the significance of a ruling that the Non-Compete Agreement is void or unenforceable, the Court prefers to address the issue on much more complete briefing.

Turning to the Contributor Agreement, Van Dijk says that Genworks' claim of breach must be dismissed because the Contributor Agreement required him to assign Genworks an ownership interest in a work only if he decided to contribute the work to Genworks. (R. 15, PID 242.)

The Court tends to agree with Van Dijk's reading of the Contributor Agreement. The agreement required Van Dijk to assign Genworks an ownership interest in a "contribution." (R. 13, PID 168.) It then defined "contribution" to mean "source code" (or the like) "submitted by [Van Dijk] to a project" owned or managed by Genworks. (R. 13, PID 168.) In other words, based solely on the Contributor Agreement, it appears that Van Dijk only had to assign Genworks an ownership interest in code that he submitted to a Genworks project. And the Contributor Agreement did not require Van Dijk to make any submissions to a Genworks project.

Even so, dismissal is not warranted. As Genworks points out, the Non-Compete Agreement included this provision: "As a condition for Genworks to provide any support, explanation, or code extensions [*sic*] required for Recipient's understanding and use of the Information, *Recipient must agree to contribute any useful results or derivations from the Information back to Genworks* under the terms of the Genworks Contributor Agreement (provided separately)." (R. 13, PID 158 (emphasis added).) It is plausible that the emphasized language placed an affirmative duty on Van Dijk to contribute works derived from the information shared under the Non-Compete Agreement. Van Dijk has made no attempt to address this contract language. Based on the pleadings, the Court will thus not dismiss Genworks' claim that Van Dijk breached the Contributor Agreement.

38

* * *

In sum, the Court finds that Van Dijk has shown that Genworks' claim based on the AGPL is inadequately pled. But Van Dijk has not persuaded the Court that Genworks' claims based on the SLA, Non-Compete Agreement, and Contributor Agreement are implausible.

**D.**

Van Dijk also makes a number of arguments for why Genworks' promissory-estoppel and unjust-enrichment claims should be dismissed.

Regarding promissory estoppel, Van Dijk first says that Genworks has not pled the promises or representations upon which it relied. (R. 15, PID 243.)

The Court disagrees. Cooper's affidavit states, "In reliance upon Defendant's acceptance of the terms set forth in the SLA, NCA, CA, and AGPL, the Defendant and I engaged each other in numerous communications." (R. 13, PID 192.) In addition, Genworks' complaint identifies particular provisions of each of the four contracts that Van Dijk allegedly breached. (R. 13, PID 130–31.) Genworks thus provided Van Dijk with fair notice of the promises or representations upon which it allegedly relied: the asserted contractual provisions.

Van Dijk also argues that Genworks cannot maintain promissory-estoppel and unjust-enrichment claims because there are contracts that govern the parties' rights. But when, as here, the defendant does not concede the validity of the contracts, a plaintiff can plead in the alternative. *See CXA-16 Corp. v. Telefar Assocs., LLC*, No. 15-14316, 2016 WL 4720421, at *3 (E.D. Mich. Sept. 9, 2016) ("Defendants have not admitted to the execution, validity, or terms of the Guaranty upon which Plaintiff's complaint is based. Plaintiff may plead both contract-based claims and a promissory estoppel claim in the alternative since there are questions of fact regarding the contract at issue and its terms and coverage."); *Wake Plumbing & Piping, Inc. v.*

39

*McShane Mech. Contracting, Inc.*, No. 12-12734, 2012 WL 6591664, at *3 (E.D. Mich. Dec. 18, 2012) (similar).

Finally, Van Dijk argues that it is ParaPy B.V., not him, that received licensing revenue so it is ParaPy B.V., and not him, that was unjustly enriched. (R. 15, PID 243.) Although it might be that ParaPy B.V. directly received the licensing revenue, it is not implausible that Van Dijk was enriched when that happened: Van Dijk is the founder, owner, and the CEO of ParaPy B.V.

In short, the Court will not dismiss Genworks promissory-estoppel and unjust enrichment claims.

**E.**

Van Dijk similarly asserts that Genworks' tortious interference claim must be dismissed because any tortious interference was done not by him but by ParaPy B.V. (R. 15, PID 244.)

This argument ignores this point of law: "[i]t is a familiar principle that the agents and officers of a corporation are liable for torts which they personally commit, even though in doing so they act for the corporation, and even though the corporation is also liable for the tort." *Warren Tool Co. v. Stephenson*, 161 N.W.2d 133, 148 (Mich. Ct. App. 1968); *see also Baranowski v. Strating*, 250 N.W.2d 744, 749 (Mich. Ct. App. 1976).

Van Dijk also argues that Genworks' tortious interference claim must be dismissed because Genworks "has failed to specifically identify any specific contracts or expectancies that have been interfered with." (R. 15, PID 244.)

This argument ignores allegations in Genworks' complaint. Genworks pled, "All of ParaPy's customers, such as the Technical University of Delft[,] . . . Fokker Aerostructures, Fokker Elmo, and any other customer of [Van Dijk's] ParaPy software are the result of the tortious interference of [Van Dijk] with respect to the customers and/or business relationships of

40

Genworks." (R. 13, PID 122.) Genworks also pled that Van Dijk "induced several individuals associated with the University to breach the SLA . . . between Genworks and TU Delft." (R. 13, PID 122.) And Genworks alleged that it "has existing contractual arrangements and business interests with a wide number of users of KBE systems, including but not limited to TU Delft." (R. 13, PID 140.) These allegations make it plausible that Van Dijk or ParaPy B.V. (or both) have at least interfered with Genworks' contract with TU Delft. Genworks thus has adequately pled at least one contract or business relationship that Van Dijk interfered with.

## F.

Finally, Van Dijk says that Genworks has not stated a claim under the Michigan Uniform Trade Secrets Act. (R. 15, PID 247–48.) MUTSA prevents "misappropriation" of trade secrets. *See* Mich. Comp. Laws §§ 445.1903, 445.1904. It defines "misappropriation" as (1) the "[a]cquisition of a trade secret . . . by a person who knows or has reason to know that the trade secret was acquired by improper means" or (2) the "[d]isclosure" or "use" of a trade secret in one of three ways, including disclosure or use with knowledge that the trade secret was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *See* Mich. Comp. Laws § 445.1902. Van Dijk argues that it is not plausible that he misappropriated a trade secret by improper acquisition because Genworks gave him access. (R. 15, PID 248.) And he says it is not plausible that he misappropriated a trade secret by disclosure of it because "it is only plausible that ParaPy B.V. is using the alleged stolen or copied IP in its software." (*Id.*)

These arguments do not persuade. At a minimum, Genworks allegations make it plausible that Van Dijk misappropriated its trade secrets by disclosing or using its trade secrets in a manner prohibited by MUTSA. The Non-Compete Agreement, which Van Dijk signed, required him to "keep secret and confidential the Information and will refrain from disclosing it to any

41

third party." (R. 13, PID 158.) And Genworks has pled that Van Dijk shared the confidential information it provided under the Non-Compete Agreement with the co-creator of ParaPy Software. (R. 13, PID 131.) Further, in signing the Non-Compete Agreement, Van Dijk agreed "to refrain from using the Information in any manner or for any purpose which can be considered as competitive with Genworks, as determined by Genworks." (R. 13, PID 158.) And Genworks has pled that Van Dijk "used the information and understanding he received through the [Non-Compete Agreement] to create ParaPy Software, a direct competitor to the GDL Software." (R. 13, PID 131.) Thus, Genworks has pled "[d]isclosure or use of a trade secret . . . by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]" Mich. Comp. Laws §§ 445.1902. And that amounts to "misappropriation" under MUTSA. *See id.*

Van Dijk further argues for dismissal of Genworks' trade-secret claim on the grounds that damages for misappropriation "would all be caused by ParaPy B.V., not Defendant." (*Id.*)

Misappropriating trade secrets is a tort. *See MSC.Software Corp. v. Altair Eng'g, Inc.*, No. 07-12807, 2016 WL 1714873, at *2 (E.D. Mich. Jan. 7, 2016). Generally, one is liable in tort for injuries that he proximately caused. *See Schultz v. Consumers Power Co.*, 506 N.W.2d 175, 177 (Mich. 1993); *Cassidy v. Kraft-Phenix Cheese Corp.*, 280 N.W. 814, 819 (Mich. 1938). MUTSA's damages provision does not appear to create an exception to the general rule: it permits recovery for "the actual loss caused by misappropriation." Mich. Comp. Laws § 445.1904. True, it also permits recovery for "the unjust enrichment caused by misappropriation," but that remedy is only to compensate for damages "not taken into account in computing actual loss." *Id.* Thus, even if it is ParaPy B.V. that is licensing ParaPy Software,

42

Genworks may still recover from Van Dijk under MUTSA so long as his disclosure or use of Genworks' trade secrets proximately caused ParaPy B.V.'s licensing. That is plausible: Genworks has pled that Van Dijk disclosed and used its trade secrets in creating ParaPy Software, that Van Dijk is the founder, CEO, and owner of ParaPy B.V., and that ParaPy B.V. licenses ParaPy Software.

**V.**

With all that has been said, a summary is appropriate.

Regarding personal jurisdiction, viewing the submissions in the light most favorable to Genworks, Genworks has carried its "relatively slight" burden of showing that this Court may, consistent with the Due Process Clause, require Van Dijk to defend claims based on the Non-Disclosure/Non-Compete Agreement in this forum. The remainder of Genworks' claims overlap with those based on the Non-Compete Agreement such that the increased burden on Van Dijk of defending all of Genworks' claims in this forum does not offend due process. Thus, this Court may exercise personal jurisdiction over Van Dijk with respect to all claims.

Regarding the doctrine of *forum non conveniens*, substantial deference is owed to Genworks' choice of this forum and, save for Genworks' claim under Dutch copyright law, Van Dijk has not shown that this forum is so inconvenient as to overcome that deference. As to the Dutch copyright claim, the Court will dismiss that claim if, within seven days of this order, Van Dijk files a stipulation agreeing to the following: (1) that if sued in the Netherlands for copyright infringement based on the facts of this case, he will not contest jurisdiction and will accept process, (2) that any statute-of-limitations defense to the Dutch copyright claim that did not exist prior to the filing of this case is waived, and (3) that Genworks may refile its Dutch copyright claim in this case should Dutch courts deny jurisdiction. *See Solari v. Goodyear Tire & Rubber*

43

*Co.*, 654 F. App'x 763, 767–68 (6th Cir. 2016). The Court will not dismiss or transfer the remaining claims in this case under the doctrine of *forum non conveniens*.

Regarding Rule 12(b)(6), Van Dijk has persuaded the Court that Genworks has not adequately pled that he breached the AGPL and that he violated the U.S. Copyright Act. Van Dijk's other arguments under Rule 12(b)(6) are either not adequately developed or unpersuasive.

Accordingly, Van Dijk's motion to dismiss (R. 15) is GRANTED IN PART and DENIED IN PART. Count I is DISMISSED WITHOUT PREJUDICE insofar as it asserts that Van Dijk breached the AGPL, Count IV (asserting a violation of U.S. copyright law) is DISMISSED WITH PREJUDICE in its entirety, and Count V (asserting a violation of Dutch copyright law) is conditionally DISMISSED WITHOUT PREJUDICE. All other claims are properly before the Court.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: September 7, 2017          U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 7, 2017.

s/Keisha Jackson
Case Manager